JOHN STIEBERT, (Plaintiff) Respondent, v. MAY DEPARTMENT STORES COMPANY, a Corporation, (Defendant) Appellant.—No. 40953. —218 S. W. (2d) 113.

Division Two, February 14, 1949.

Appellant's Motion for Rehearing Denied in Per Curiam Filed, March 14, 1949.

920

*Richard S. Bull* for appellant; *Carter, Bull, Garstang & McNulty* of counsel.

*Louis E. Miller, Miller & Landau* and *B. Sherman Landau* for respondent.

922

[113] ELLISON, J.—The defendant appeals from a judgment for $20,000 damages for personal injuries recovered against it by the plaintiff-respondent in the circuit court of the City of St. Louis. Respondent's injuries were allegedly sustained through the falling of [114] a piece of 2"x4" scantling of yellow pine lumber about 18 inches long with nails driven on the end, from one of the upper stories on the east side of the Railway Exchange Building in St. Louis about 1 p. m. on August 11, 1941. It struck him on the head and arm, he then being a pedestrian on the public sidewalk on Sixth Street bordering that side of the building, in the busy retail district of St. Louis. Respondent did not see the scantling fall, and three witnesses of the res gestae had either died or moved to an unknown address. The cause was tried under the res ipsa loquitur doctrine, and appellant's two points, or assignments of error, are that: (1) respondent failed to make a submissible case for the jury under that doctrine, because his evidence was too indefinite, and his injuries were inflicted by an independent contractor; (2) his counsel's closing argument to the jury was prejudicially erroneous.

There is no serious contention that the scantling did not fall from some of the upper stories of the building [though appellant's counsel speculates it might have fallen from a passing truck or a building across the street]. But the difficulties of the case arise from the fact that the Railway Exchange Building is a large structure 21 stories high, perpendicularly flush with the abutting Sixth Street sidewalk, and occupied by a number of tenants on the east side. So the initial problem is to determine whether there is substantial evidence indicating from what floor and rented space the scantling was dropped, and who had the management and control of that space and certain work being done there, as hereafter stated.

The appellant corporation in the name of or through a subsidiary, Famous-Barr Company, wholly occupied the first 12 stories and basement, and the east half of the 13th story in the operation of a large department store. Respondent's petition charges the scantling fell or was thrown from one of those floors. The appellant's answer admitted it controlled them but generally denied all the other allegations of the petition. The space above that, from the 14th to the 21st floors, on the east side was occupied by some 27 other tenants of the owner of the building, the Railway Exchange Building Co., Inc., and there were some vacancies. So respondent's effort was to establish by a process of elimination and circumstantial evidence that appellant was the culprit.

The appellant Stores Company had leased the east half of the 13th floor, only about a month earlier, and at the time of the casualty was altering, partitioning and remodeling it, and installing a stairway. Scantlings of the kind here involved were used in some of these operations for scaffolding. They were sawed to fit the particular scaf-

folds constructed, and the waste pieces would fall to the floor with other debris. A truck driver, Janovich, testified that on the day after the casualty he hauled debris from that construction work, which contained pieces of 2″x4″ lumber. He went to the 13th floor whence that debris came and saw "all kinds of construction work" going on.

Part of this work was done by the Westlake Construction Co., a general building contractor with offices in the same building. Its president, Mr. Reed, testified the company frequently did work of that kind for the Stores Company. He regarded his Construction Company as an independent contractor, and said it always did its work under contract unless the job was a small one, in which event it was done on mere written "order." In the instant case the work was of that character. He was unable to find any written contract or even order for it, but it was shown that his company had purchased 2″x4″ scantlings for the work four days before the casualty. Furthermore, it was disclosed that there were no plans and specifications for the job except a floor plan, in consequence of which the Construction Company had to work under the directions of the "store architect" in doing much of it. Mr. Reed, president of the Construction Company, conceded the store architect was *his* "boss", but insisted the architect could not give orders to the Construction Company's employees, although he (Reed) had only been on the job once for a few minutes, where he, himself, could give such orders.

[115] But it also appeared that considerable work was being done on the job beside that undertaken by the Westlake Construction Company. Mr. Reed and the store architect both stated the latter work embraced only the wrecking of the partitions already in place, and the building of the stairway. It did *not* include the lathing and plastering for new partitions and walls in which the 2″x4″ timbers were chiefly used. And the store architect, who was a permanent official or employee of the Stores Company, testified by deposition (he had died before the trial) that a crew of artisans, such as carpenters, painters and plasterers, was permanently retained by the Stores Company to do repair, maintenance and alteration work which was going on all the time. They worked under the supervision of the store architect, and his records showed some of the carpenters worked on the east half of the 13th floor during the week ending August 16, when the plaintiff-respondent was injured by the fall of the 2″x4″ scantling. They were putting in shelving. Charles Jungling, foreman of this crew, testified they installed a partition on the 13th floor in August, using 2″x4″ scantlings for scaffolding. And several plasterers in his crew testified they worked at plastering on that floor on or about August 11, and that 2″x4″ scantlings were used for plasterer's scaffolding, but none of them saw any of that scaffolding done at the time, and they were uncertain as to the date. Some of this

work obviously was on the east wall nearer the windows than the stairway, which was 15-20 feet west of the east wall.

The evidence tending to show the scantling had not fallen from any floor above the 13th was as follows. Space on those floors was rented to tenants by the Railway Exchange Building, Inc., owner of the building. It had nothing to do with appellant's alteration work on the 13th floor. The Stores Company merely leased its space on that and lower floors and did its own repair and alteration work at its option. But the tenants on the upper floors renting directly from the owner corporation could not make alterations without its permission. And no such work was being done at the time by any of those tenants, nor by the owner corporation itself [which had a few workmen permanently employed],.so far as its officials in charge knew. In fact, within a few minutes after the respondent was struck by the falling piece of scantling he went to the office of the Assistant Manager of the owner corporation and made complaint, and left the scantling there. Another assistant manager made an immediate investigation,.looked into the vacant offices, and part of those that were occupied, and found no construction work going on and nothing to indicate the scantling had come from them. However, there was testimony that 2"x4" scantlings were used in a.few instances by tenants on the upper floors as a support for safes or filing cabinets, to hold them off the floor, but their length was not shown.

 In our opinion the evidence was sufficient to take the case to the jury under the doctrine of res ipsa loquitur. Certainly the casualty was extraordinary, and such as would not have occurred without the negligence of someone. The evidence for respondent tended to show the piece of scantling came from the 13th floor where such lumber was being used, and waste pieces of it were falling on the floor in the debris. It was also on a summer day in August when the windows probably would be open. On the other hand the evidence also indicated the scantling did not come from any floor above that, where no such work was being done. This was not a mere piling of disconnected inferences. It was substantial evidence of the more probable cause of respondent's injuries. Wills v. Berberich's Delivery Co., 345 Mo. 616, 624(3), 626(5), 134 SW. (2d) 125, 129(3, 4), 130(7, 8); Neal v. K. C. Pub. Serv. Co., 353 Mo. 779, 788(3), 184 SW. (2d) 441, 445(5).

 As to who had the management and control of the 13th floor and the operations thereon, it seems to us immaterial whether or not the Westlake Construction Company was an independent contractor or not in a loose legal sense. For under the facts of this case the plans for the work were so incomplete that all the workmen and foremen, regardless of who paid their wages, were dependent on the instructions of the store architect, who was a regular Stores [116] Company employee. The crews of both employers were working to-

gether in a comparatively limited space under the general supervision of the store architect, and there can be no doubt that he had general control of the work. This brings the case within the ruling in such decisions as McCloskey v. Koplar, 329 Mo. 527, 535(6), 46 SW. (2d) 557, 560(2), 92 A. L. R. 641, and Pandjiris v. Oliver Cadillac Co., 339 Mo. 711, 719(1), 98 SW. (2d) 969, 973(6, 7). Perhaps it also comes within the rule of Stubblefield v. Fed. Reserve Bank, 356 Mo. 1018, 1026-7(5), 204 SW. (2d) 718, 722(7), though the work here was not so dangerously inherent to pedestrians on the sidewalk as it was in that case.

■ Appellant's second point is that the closing argument of respondent's counsel to the jury was prejudicially erroneous. It concerned the deposition of the deceased architect for the Stores Company, which had already been read to the jury during the trial in behalf of respondent, with appellant's then counsel following and checking on a copy.

When respondent's counsel started to reread portions of the same deposition to the jury in closing argument, with appellant's counsel attempting to check on another copy, the latter objected unless he were permitted also to reread to the jury such parts of it as he desired—this notwithstanding he had already concluded his argument and respondent's counsel was entitled to the closing argument. He suggested a denial of his request would be a violation of the rules of this court, meaning, as we take it, Sec. 4.22(2) of the Canons of Ethics, which, speaking of lawyers, provides: "It is not candid or fair for the lawyer knowingly . . in these jurisdictions where a side has the opening and closing argument to mislead his opponent by concealing or withholding positions in his opening argument upon which his side then intends to reply."

The trial court overruled the objection, holding it would be no different from a lawyer's having the court reporter copy some oral testimony of a witness and then read it to the jury in closing argument. Then respondent's counsel proceeded to read the deposition to the jury. What he read, as the reporter took down and transcribed that part of his argument, covers only a little over $2\frac{1}{2}$ pages. But actually it drew from thirteen pages of the transcript, a few questions and answers here, only one question and answer on another page, and so on—scarcely any of it consecutive, and much of it hardly making sense for that reason. Appellant's attorney could not possibly follow on his own copy of the deposition, and the pages thereof were not stated as arguing counsel proceeded. It was an act of discourtesy, but in most instances correctly read, so far as it went.

The only point on which appellant's present counsel really makes an issue here is this. In the deposition introduced in evidence respondent's counsel had asked the architect whether he had recently examined the records of the Famous-Barr Company to see what work

was done by the Westlake Construction Company on the 13th floor "early in August, 1941, or whether he was testifying from recollection, and the witness answered the latter. Then the following questions and answers appear in the deposition:

Q. "Now what is the next sheet, Form 26?

A. "That is the carpenter list.

Q. "And the next one, is that a carpenter list too?

A. "That is a carpenter list too.

Q. "For the week ending August 23rd? A. 23rd.

Q. "Was there any work done on the 13th floor?

A. "Yes.

Q. "What is that item?

A. "Drapery work room, 101 hours; and stationary shelving, 104 hours.

Q. "Do you know what was done in the draperies?

A. "Yes, we built a lot of shelving.

Q. "When you say 'we' you mean the Famous-Barr Company?

A. "That is right."

But when respondent's counsel in argument came to that page of the deposition, he read to the jury only the single question and answer: Q. "What is that item? A. Drapery work room, 101 hours, and [117] stationary shelving, 104 hours." Then he, himself, stated to the jury "That was performed admittedly by Famous-Barr on the 13th floor." The then counsel for appellant immediately objected, saying: "There is not a single piece of evidence in that deposition indicating that was work done in the drapery department on the 13th floor." The court called for the deposition, and of course found at once, as shown above, that the architect had testified "a lot of shelving" was built in that department by Famous-Barr, the trade name for appellant. So the objection was overruled.

But appellant now raises a different point not made in the trial court. He refers to the above questions and answers in the deposition showing there were two carpenter lists, the "next" or second one being for the week ending August 23. And he contends the deposition means the carpenter work was done on the 13th floor during that week, *after* the respondent was injured on August 11, instead of during the week ending August 16. But it may have meant such work was done both weeks, and there is other corroborating evidence that alteration work was going on at the time of and before respondent's injury. We cannot reverse and remand the cause on that ground.

Finding no reversible error, the judgment is affirmed. All concur.

■ PER CURIAM:—Appellant's motion for rehearing complains that two prejudicial misstatements of fact are made in the third and fifth sentences, respectively, of the sixth paragraph of the opinion.

928

The first of these states, concerning the work to be done by the independent contractor: "It did *not* include the lathing and plastering for new partitions and walls in which the 2″x4″ timbers were chiefly used." [Last italics ours.] In other words, appellant's own workmen plastered the walls. Appellant says the evidence is conclusive that these 2″x4″ timbers did not enter into the construction of the partitions and walls at all, because they were built of metal lath, channel iron studding and plaster. That is true.

But appellant further says the evidence is that "no lumber was *used* in this work." That is incorrect. The appellant's foreman, Charles Jungling [Record, p. 261-2] testified that 2″x4″'s were used for *scaffolding* in building the partitions and walls. Furthermore some of the workmen who said they were engaged in the plastering on or about August 11, 1941, the date of the casualty [Record, pp. 135, 137, 152] testified wooden scaffolding was used in that work, though they did not erect them. It is immaterial whether the 2″x4″'s were used as construction materials or as erection materials. The point is that 2″x4″'s were on that part of the thirteenth floor for use by appellant at the time of the casualty.

The second sentence in the opinion, of which complaint is made, states the records of the appellant's store architect showed some of the store's carpenters worked on the east half of the thirteenth floor during the week ending *August 16*, which included August 11, the date of the casualty. Appellant says that is not correct—that it was the following week, ending August 23. This statement also is erroneous. The deposition of appellant's store architect stated the plasterers were included in the carpenters' payroll [Record, p. 170]; that they worked on the thirteenth floor on the week ending August 9, for which $442 was charged [Record, p. 193-4]; that they worked the week of August 16 for which $156 was charged for improvements, and $274, a lot of which was for patching [Record, p. 181-2]; that the carpenters worked on that floor the same week and for the week ending August 23 [Record, p. 184]; and another item for Department 381, shows the carpenters worked on that floor the week ending August 16 [Record, p. 194].

We find no errors in the opinion and the motion for rehearing is overruled.